## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| PURE ENCAPSULATIONS, LLC, | : |
| 490 Boston Post Road | :    Case No: |
| Sudbury, Massachusetts 01776 | : |
| | :    **COMPLAINT** |
| Plaintiff, | : |
| | :    **DEMAND FOR JURY TRIAL** |
| v. | : |
| | : |
| TSALEVICH LLC | : |
| 18 Claudia Court | : |
| Staten Island, New York 10303 | : |
| | : |
| And, | : |
| | : |
| HELEN THOMAS LLP | : |
| 18 Claudia Court | : |
| Staten Island, New York 10303 | : |
| | : |
| And, | : |
| | : |
| MICHAEL TSALEVICH | : |
| 18 Claudia Court | : |
| Staten Island, New York 10303 | : |
| | : |
| And, | : |
| | : |
| HELEN TSALEVICH a/k/a HELEN | : |
| THOMAS | : |
| 18 Claudia Court | : |
| Staten Island, New York 10303 | : |
| | : |
| And, | : |
| | : |
| JOHN DOES 1-100, individually or as | : |
| corporate/business entities, | : |
| | : |
| Defendants. | : |
| | : |

## COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 USC § 1125(a); AND RELATED CLAIMS

Plaintiff Pure Encapsulations, LLC ("Pure Encapsulations") brings this action against Defendants Tsalevich LLC ("Tsalevich"), Helen Thomas LLP ("Helen Thomas"), Michael Tsalevich ("Michael"), Helen Tsalevich a/k/a Helen Thomas ("Helen"), and John Does 1-100 (collectively, "Defendants") for unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); common law unfair competition; unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A; and tortious interference with contract and business relations, and alleges as follows.  These claims arise from Defendants' unlawful and unauthorized sale of Pure Encapsulations®-brand products on the Internet, including the sale of non-genuine and poor quality products.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Pure Encapsulations, LLC is a Delaware limited liability company with its principal place of business located in Sudbury, Massachusetts.

2.      Upon information and belief, Defendant Tsalevich LLC is a limited liability company, organized under the laws of the state of New York, with its principal place of business in Staten Island, New York, who operates and does business throughout the United States under the "Vitaworld" and "PA Nutrition" storefronts on www.amazon.com ("Amazon").

3.      Upon information and belief, Defendant Helen Thomas LLP is a limited liability partnership, organized under the laws of the state of New York, with its principal place of business in Staten Island, New York, who operates and does business throughout the United States under the "Vitaworld" and "PA Nutrition" storefronts on Amazon.

4.      Upon information and belief, Defendant Michael Tsalevich is a natural person who resides in Staten Island, New York, and who does business throughout the United States as the operator of the "Vitaworld" and "PA Nutrition" storefronts on Amazon.  Upon

2

information and belief, Mr. Tsalevich directs, controls, ratifies, participates in, and is the moving force behind the unlawful activity alleged herein.

5.      Upon information and belief, Defendant Helen Tsalevich a/k/a Helen Thomas is a natural person who resides in Staten Island, New York, and who does business throughout the United States as the operator of the "Vitaworld" and "PA Nutrition" storefronts on Amazon.  Upon information and belief, Ms. Tsalevich directs, controls, ratifies, participates in, and is the moving force behind the unlawful activity alleged herein.

6.      The true names, involvement, and capacities, whether individual, corporate, associated or otherwise of Defendants John Does 1 through 100 are unknown to Pure Encapsulations.   Therefore, Pure Encapsulations sues these Defendants by a fictitious name. Pure Encapsulations is informed and believes, and on that basis alleges, that the John Doe Defendants sued herein are equally responsible for the events and occurrences referred to herein or otherwise interested in the outcome of the dispute.  When the true names, involvement, and capacities of these parties are ascertained, Pure Encapsulations will seek leave to amend this Complaint accordingly.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338 for Pure Encapsulations' claims that arise under federal law and 28 U.S.C. § 1367 for Pure Encapsulations' claims that arise under state law because they form part of the same case or controversy as Pure Encapsulations' claims that arise under federal law.

8.      This Court has personal jurisdiction over Defendants because they have sold, distributed, offered for sale, and/or advertised goods in Massachusetts and directed their tortious activities toward Massachusetts by engaging in actions with the knowledge that their

actions would likely injure Pure Encapsulations in Massachusetts. Defendants have (1) transacted business in Massachusetts; (2) contracted to supply goods in Massachusetts; (3) caused tortious injury by acts or omissions in Massachusetts; and (4) caused tortious injury to Pure Encapsulations in Massachusetts by acts or omissions outside of Massachusetts while regularly doing or soliciting business, or engaging in other persistent course of conduct, or deriving substantial revenue from goods used or consumed or services rendered in Massachusetts.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district and because Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Pure Encapsulations and Its Products

10.     Pure Encapsulations manufactures and sells ingestible, high-quality hypoallergenic, research-based dietary supplements. Pure Encapsulations sells its products exclusively through a network of authorized resellers ("Authorized Resellers").

11.     Pure Encapsulations devotes a significant amount of time, energy, and resources toward protecting the value of the Pure Encapsulations brand, products, name, and reputation. By distributing Pure Encapsulations products exclusively through its Authorized Resellers, Pure Encapsulations is able to ensure the safety, well-being, and satisfaction of consumers and maintain the integrity and reputation of the Pure Encapsulations brand. In the highly competitive dietary supplement market, quality and customer service are a fundamental part of the consumer's decision to purchase a product.

12.     Consumers recognize Pure Encapsulations as the name associated with manufacturing high-quality hypoallergenic, research-based dietary supplements that are sourced from pure, premium ingredients.

13.     Pure Encapsulations is known for manufacturing products that are pure and free from wheat and gluten, egg, peanuts, coatings and shellacs, GMOs, magnesium stearate, trans fats and hydrogenated oils, artificial colors, flavors and sweeteners, and unnecessary binders, fillers, and preservatives.   The products are produced locally and formulated with premium raw ingredients and are scientifically tested to ensure that each ingredient and final product meets its quality standards.

14.     Pure Encapsulations is also recognized for its manufacturing and quality control excellence, as all products are manufactured in Pure Encapsulations' state-of-the-art plant in Massachusetts under strict manufacturing standards.

### Online Marketplaces and the Challenges They Present to
### Pure Encapsulations Product Quality

15.     E-commerce retail sales have exploded over the past decade.   From 2007 to 2017, the percentage of retail sales that were completed through e-commerce channels rose from 3.1% to 8.2%.   https://www.digitalcommerce360.com/2017/02/17/us-e-commerce-sales-grow-156-2016/; https://fred.stlouisfed.org/series/ECOMPCTSA.

16.     In 2016, consumers spent $394.86 billion on e-commerce sales, a 15.6% increase from 2015.   *Id.*   The massive growth in e-commerce is being driven largely by sales on online marketplaces.   For example, in 2016 United States consumers spent $147.0 billion in e-commerce sales on Amazon, a 31.3% increase from 2015.   *Id.*

ME1 29060617v.1

17.     While the online marketplaces have created a great deal of opportunity, they also greatly challenge a manufacturer's ability to control the quality and safety of its products.

18.     For example, consumers who purchased products through the online marketplaces cannot touch, inspect, or interact with the product before purchasing it and cannot select a different product if the one they initially select is damaged or has been tampered with. Instead, consumers must trust that the product they choose over the Internet will arrive and be of the quality they expect and typically receive from the manufacturer.

19.     The marketplaces also allow third-parties to sell products anonymously, i.e., without disclosing their actual identity or sources to consumers.  As such, any person who is able to obtain a manufacturer's products through unauthorized diversion can sell them on the online marketplaces without having to reveal his/her identity to the consuming public.  This effectively prevents the manufacturer and the consumer from being able to reach sellers, like Defendants, and address quality issues.

20.     It is common for these unauthorized sellers to sell diverted products well past their expiration date or to mix fake or diluted products in shipments to unwitting consumers. https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html.  Indeed, there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust these marketplaces and think that the products they are buying through these marketplaces are genuine. https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes.

21.     Because these diverters, like Defendants, operate anonymously on marketplaces and undertake great measures to maintain anonymity, manufacturers have no

ability to exercise their quality controls over the products they sell or to ensure that the products are safe.   A manufacturer's inability to exercise control over the quality of these products presents serious risks to the health and safety of consumers – particularly where, as here, the product is ingested by the consumer.

22.     Online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity because their construction and user interface suggest that all sellers on the marketplaces are all selling the same product when – as is the case here – they are not.

23.     When purchasing product on a marketplace, customers cannot easily distinguish between a manufacturer's authorized and unauthorized sellers.   Indeed, on some marketplaces, all sellers are listed under one product listing, making it practically impossible for consumers to ascertain which sellers are authorized and subject to the brand's quality standards and which are selling unauthorized products outside of the manufacturer's quality controls. Unlike brick-and-mortar channels where a consumer can simply select another product from the shelf where the initial product selected appears to be of compromised quality, e-commerce consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality.   This reality requires that brands implement unique quality control programs into their e-commerce channels to protect their goodwill and consumers.

24.     It is widely understood that when a customer purchases a product on an online marketplace and receives a damaged, defective, expired, or poor quality product, the customer is much more likely to associate that frustration with the brand/manufacturer than the anonymous seller.

ME1 29060617v.1

25.     The online marketplaces give disgruntled customers a powerful and convenient forum to air their grievances about poor quality products – product reviews.  Any consumer who is dissatisfied with a product he/she receives can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand/manufacturer of a product rather than the marketplace seller that sold the product.

26.     It is widely accepted that product reviews on the online marketplaces have significant impact on a brand's reputation.  Survey results show that 82% of United States adults sometimes consult online reviews when buying a new product online and 40% "always" or "almost always" consult reviews.  http://www.pewinternet.org/2016/12/19/online-reviews/.

27.     Consumers place extraordinary trust in these online reviews, as they are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers.  https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.

28.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product.  https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to- deter-shoppers.

**Pure Encapsulations Has Been the Target of Multiple Negative Online Marketplace Reviews from Customers Who Purchased Products from Unauthorized Sellers**

29.     Pure Encapsulations has been a victim of the issues caused by unauthorized sellers on the online marketplaces.  Indeed, Pure Encapsulations has received

several negative online marketplace reviews from customers who purchased products from unauthorized sellers.

30.     For example, on January 1, 2018, a customer, Ebony Shunta Noble, complained that she received a poor quality product: "Low quality product."



31.     On February 1, 2018, a customer complained that she received a tampered-with product: "This product arrived with the safety seal completely missing. I will be returning it and will never order again."



32.     On February 2, 2018, a customer, Dog Lover, complained that he received a knockoff product: "I purchased this product after having good results previously, but when I received this I noticed the capsules had a strange fruity taste and smell. After checking with the manufacturer and other purchasers, it appears that this product should not have a strong taste or smell. Will be returning, but beware of this seller as it seems they are selling off products."



I purchased this product after having good results previously, but when I received this I noticed the capsules had a strange fruity taste and smell. After checking with the manufacturer and other purchasers, it appears that this product should not have a strong taste or smell. Will be returning, but beware of this seller as it seems they are selling off products.

33.     On February 3, 2018, a customer, Asya, complained that she received a tampered-with product: "As soon as I received it, I opened this bottle to take with my daily vitamins I noticed that there were ONLY 15 instead of 60 pill!!! I am so disappointed ☹, and it costs more than $20.00,..for what??!"



As soon as I received it, I opened this bottle to take with my daily vitamins I noticed that there were ONLY 15 instead of 60 pill!!! I am so disappointed 😊, and it costs more than $20.00,..for what??!

34.     On July 9, 2018, a customer complained that he received a poorly packaged product: "Product was sent with a small gel pack and was scorchingly hot, which makes it completely useless, as the probiotics must remain cold to be effective. Huge disappointment. My bad for trying to save money. I'll be ordering only from Pure Encapsulations website next time."



Product was sent with a small gel pack and was scorchingly hot, which makes it completely useless, as the probiotics must remain cold to be effective. Huge disappointment. My bad for trying to save money. I'll be ordering only from Pure Encapsulations website next time.

35.     On July 16, 2018, a customer, AC, complained that he received a poor quality product: "Is this normal?"

ME1 29060617v.1



AC

⭐☆☆☆☆ **See the photo**

July 16, 2018

**Verified Purchase**

Is this normal?

36.     On October 4, 2018, a customer, Sara Holmes, complained that she received a poor quality product: "All the pills in the bottle are covered in a white film and it is non returnable."



Sara Holmes

⭐☆☆☆☆ **Film on pills. Non refundable**

October 4, 2018

Size: 180 Count | Package Type: Standard Packaging | **Verified Purchase**

All the pills in the bottle are covered in a white film and it is non returnable.

37.     On December 31, 2018, a customer, Ms Reads A Lot, complained that she received a tampered-with product: "Received a bottle that had been previously opened! Sketchy!"



Ms Reads A Lot

⭐☆☆☆☆ **Buyer beware!**

December 31, 2018

Size: 180 Count | **Verified Purchase**

Received a bottle that had been previously opened! Sketchy!

| Helpful |   ⌄ 1 comment | Report abuse

38.     On January 1, 2019, a customer, karina, complained that she received a fraudulent product: "This is a fraud. Do not buy."



39.     Upon information and belief, the foregoing complaints were made by consumers who purchased products from unauthorized sellers of Pure Encapsulations products.

40.     Upon information and belief, other consumers have complained about the products they received from unauthorized sellers, like Defendants, including the sale of expired, damaged, defective, and/or tampered-with products.

**Pure Encapsulations Has Implemented Strict Quality Controls to Combat the Problems Presented by the Online Marketplaces**

41.     Recognizing the health and safety risks to its consumers and the reputational concerns associated with the illegal sale of Pure Encapsulations products by unauthorized sellers, Pure Encapsulations has implemented a quality control program that applies to both brick and mortar retail settings and online sellers with the twin aims of protecting consumers and protecting the value and goodwill associated with the Pure Encapsulations brand.

42.     The goal of this program is to ensure that consumers who buy Pure Encapsulations products online receive products that feature all of the special characteristics that consumers have come to expect from products sold under the Pure Encapsulations name – in particular, safety and quality.

43.     The program seeks to minimize the likelihood that poor quality products will reach consumers.   By preventing consumers from receiving poor quality products, the program both protects consumers from confusion and unsafe products.

44.     Pure Encapsulations abides by its quality control requirements. Further, as discussed below, Pure Encapsulations requires its Authorized Resellers to abide by its quality control requirements and audits its Authorized Resellers to ensure that they abide by these quality controls.

45.     Pure Encapsulations' ability to exercise these quality controls is particularly important for the products it sells because consumers ingest the products and there are numerous health and safety risks associated with consumers ingesting products that are expired or that have not been stored and handled properly.

46.     Pure Encapsulations' ability to exercise these quality controls is essential to the integrity, safety, and quality of Pure Encapsulations products.

### Authorized Resellers Are Required to Adhere to Pure Encapsulations' Quality Control and Customer Service Requirements

47.     Pure Encapsulations maintains its strict quality controls over Pure Encapsulations products by selling them exclusively through Authorized Resellers.

48.     Authorized Resellers are required to sell Pure Encapsulations products only in approved channels and are required to abide by Pure Encapsulations' policies, purchase terms and conditions, and other sales practices (collectively, the "Pure Encapsulations Rules").

49.     To prevent third parties from acquiring and reselling Pure Encapsulations products, the Pure Encapsulations Rules permit Authorized Resellers to sell products only to end users.   Authorized Resellers are prohibited from selling Pure Encapsulations products to anyone who intends to resell the products.

ME1 29060617v.1

50.     Authorized Resellers are also prohibited from selling Pure Encapsulations products on any website without prior written consent of Pure Encapsulations.  This restriction includes a prohibition against selling Pure Encapsulations products on any third-party marketplaces such as Amazon, eBay, Jet, Rakuten, Walmart Marketplace, or Craigslist.

51.     These restrictions allow Pure Encapsulations to know who its Authorized Resellers are, which ones are selling online, and how to immediately contact them.

52.     The Pure Encapsulations Rules require Authorized Resellers to adhere to Pure Encapsulations' quality control requirements.

53.     To ensure that customers receive the genuine and high-quality products they expect from Pure Encapsulations, the Pure Encapsulations Rules require Authorized Resellers to inspect all products for damage, defects, broken seals, evidence of tampering, or other non-conformance and to remove any such products from inventory.

54.     To prevent the sale of expired products, Authorized Resellers are also required to inspect inventory regularly for expired or soon-to-be expired products and remove those products from inventory.

55.     The Pure Encapsulations Rules also require that Authorized Resellers store products in accordance with guidelines issued by Pure Encapsulations.  Importantly, for the health and safety of consumers, Authorized Resellers must store products in a cool, dry place, away from direct sunlight, extreme heat, and dampness, and in accordance with any other storage guidelines specified by Pure Encapsulations.

56.     To avoid consumer confusion and ensure that customers receive genuine Pure Encapsulations products, Authorized Resellers must sell Pure Encapsulations products in their original packaging and refrain from altering any product or removing or modifying any

14

label or literature on or accompanying the product. Authorized Resellers are prohibited from altering, defacing, or tampering with any serial number, batch or lot code, or other identifying information on any product or product packaging.

57.     Pure Encapsulations also ensures that consumers receive safe products by requiring its Authorized Resellers assist with recalls and other consumer safety information efforts.

58.     The Pure Encapsulations Rules also require that Authorized Resellers provide certain services to their customers. Authorized Resellers must familiarize themselves with the features of all Pure Encapsulations products kept in their inventory. This requirement ensures that Authorized Resellers are uniquely qualified not only to recommend the Pure Encapsulations products best suited for end-user consumers' needs and well-being, but also to advise end-user consumers on how to use Pure Encapsulations products safely and properly.

59.     Following the sale of genuine Pure Encapsulations products, Authorized Resellers supply ongoing support to end-user consumers and are endeavored to provide expeditious customer service by responding promptly to consumer inquiries.

60.     Pure Encapsulations' quality control requirements are legitimate and substantial and have been implemented so that Pure Encapsulations can control the quality of goods manufactured and sold under the Pure Encapsulations brand, so as to protect consumers, as well as the value and goodwill associated with the Pure Encapsulations brand.

61.     Pure Encapsulations' quality controls are also material, as they are designed to protect consumers and prevent them from receiving poor quality products that could harm them. These quality controls are particularly important for Pure Encapsulations products because they are ingested by consumers.

ME1 29060617v.1

62.     Consumers would find it material and relevant to their purchasing decision to know whether a Pure Encapsulations product they were considering buying was being sold by an Authorized Reseller who is subject to Pure Encapsulations' quality control requirements or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, Pure Encapsulations' quality controls and over whom Pure Encapsulations is unable to exercise its quality controls.

**Genuine Pure Encapsulations Products Come With a Guarantee**

63.     Pure Encapsulations products purchased from Pure Encapsulations and Pure Encapsulations' Authorized Resellers also come with Pure Encapsulations' Guarantee (the "Guarantee").  The Guarantee provides that Pure Encapsulations products are guaranteed for quality, purity and potency through their expiration date and allows a customer that is not completely satisfied to return the product within 30 days of purchase.

64.     Because products sold by unauthorized sellers are not subject to Pure Encapsulations' quality control requirements and Pure Encapsulations cannot ensure the quality of products sold by unauthorized sellers, the Guarantee is not available for Pure Encapsulations products sold by unauthorized sellers, like Defendants, or through unauthorized channels, unless prohibited by law.

65.     The Guarantee is a material element of genuine Pure Encapsulations products.  Consumers purchasing Pure Encapsulations products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Guarantee.

ME1 29060617v.1

**Defendants Are Illegally Selling Pure Encapsulations Products
and Interfering With Pure Encapsulations' Quality Controls**

66.     Due to the health and safety risks, as well as customer and reputational concerns, associated with the illegal sale of Pure Encapsulations products by unauthorized sellers, Pure Encapsulations polices the sale of Pure Encapsulations products online.

67.     In the course of monitoring online listings of Pure Encapsulations products, Pure Encapsulations discovered Pure Encapsulations products being illegally sold by Defendants on Amazon.

68.     Defendants are not Authorized Resellers of Pure Encapsulations products, do not comply with Pure Encapsulations' Authorized Reseller requirements, and are not subject to, and do not comply with, the Pure Encapsulations Rules.

69.     Defendants operate their business anonymously.  Defendants sell products on their Amazon storefronts anonymously and do not provide customers information about their business or how to contact them.

70.     Because Defendants are not Authorized Resellers of Pure Encapsulations products and sell products anonymously, Pure Encapsulations is unable to exercise control over the quality of the Pure Encapsulations products Defendants sell.

71.     Defendants' sale of Pure Encapsulations products interferes with Pure Encapsulations' ability to exercise quality control over Pure Encapsulations products because Pure Encapsulations is unable to audit Defendants to ensure they are complying with Pure Encapsulations' quality controls and/or close their account if they fail to comply with Pure Encapsulations' quality control requirements.

ME1 29060617v.1

72.     The products Defendants sell are not genuine Pure Encapsulations products because the products are not authorized for sale by Pure Encapsulations and are not subject to, and interfere with, Pure Encapsulations' quality controls.

73.     The products Defendants sell are materially different from genuine Pure Encapsulations products because they do not come with the Guarantee or customer service benefits that accompany genuine Pure Encapsulations products, which are essential elements of Pure Encapsulations products.

74.     Despite these facts, Defendants have sold, and continue to sell Pure Encapsulations products through the "Vitaworld" and "PA Nutrition" storefronts without Pure Encapsulations' consent.

75.     Upon information and belief, Defendants, through these storefronts, accept and fulfill orders from Massachusetts residents for Pure Encapsulations products and ship Pure Encapsulations products to persons located in Massachusetts.

**Defendants Are Selling Poor Quality Products Through Their Amazon Storefronts**

76.     Defendants do not abide by Pure Encapsulations' quality control requirements.

77.     Evidence of Defendants' failure to comply with Pure Encapsulations' quality control requirements can be seen by reviewing the customer reviews on their Amazon storefront pages.

78.     Multiple consumers have posted negative reviews about the products Defendants sold them through their Amazon storefronts or the customer service Defendants provided them.

18

79.    For example, on December 5, 2018, a customer, Janet, complained that she received an expired product: "Product expired nearly a year ago (1/2018). Would not buy from this seller again."

"*Product expired nearly a year ago (1/2018). Would not buy from this seller again.*"
By Janet on December 5, 2018.

80.    On April 9, 2018, a customer, Barbara M. Roczniak, complained that she received a poor quality product: "Great mint fragrance, uneven thickness of sticks, some are too thick to fit the openings in the wooden holders, some are too slim to carry the weight of the incensed part. Tightly packed in the plastic sleeve, so I counted them. Only 91 in the package, not 100! Well, this is the second time I'm submitting my review of this product."

"*Great mint fragrance, uneven thickness of sticks, some are too thick to fit the openings in the wooden holders, some are too slim to carry the weight of the incensed part. Tightly packed in the plastic sleeve, so I counted them. Only 91 in the package, not 100! Well, this is the second time I'm submitting my review of this product.*"
Read less
By Barbara M. Roczniak on April 9, 2018.

81.    On November 22, 2017, a customer, nathalie Fratti, complained that she never received her product: "I never got my duos yes order:(..what happened?? Thanks for you answer."

"*I never got my duos yes order:(..what happened?? Thanks for you answer*"
By nathalie Fratti on November 22, 2017.

82.    On May 31, 2017, a customer, Conrad A. Baum, complained that he received poor customer service: "Quick response for the refund as the product sent was not what I ordered but was labeled as Musk that I did request. The 'QUICK' response was actually ALMOST TOO FAST….. My 1st thought was that it was known that it was not going to be as I ordered 'Clear Pure Musk' because there was no Quick response to state that they would send the product that I ordered."

★★★☆☆ *"Quick response for the refund as the product sent was not what I ordered but was labeled as Musk that I did request. The "QUICK" response was actually ALMOST TOO FAST..... My 1st thought was that it was known that it was not going to be as I ordered "Clear Pure Musk" because there was no Quick response to state that they would send the product that I ordered. "*

Read less

By Conrad A. Baum on May 31, 2017.

83.     On March 12, 2017, a customer, Andrew Scott Hallock, complained that he received a poorly packaged product: "It smells very good…Unfortunately, so did all my other mail due to it leaking and leaking through the package and onto all my mail…I am sure my post person loved the smell too…. it would be better to package it in a small zip lock baggie next time… I will be buying this again."

★★★★☆ *"It smells very good...Unfortunately, so did all my other mail due to it leaking and leaking through the package and onto all my mail...I am sure my post person loved the smell too.... it would be better to package it in a small zip lock baggie next time... I will be buying this again. "*

Read less

By Andrew Scott Hallock on March 12, 2017.

84.     On December 20, 2016, a customer, starryvere, complained that she received a poor quality product: "LOVE the product, but it does not match the picture. Smells great but beautiful tree insignia is not visible when taped onto a dark essential oil, whereas this picture shows a clear one. That's misleading. Label looks sloppily adhered w/ bubbles. Could have made this myself with my roll on bottles/oils, but these pics looked nicer. I wouldn't give this as a gift to anyone based on the aesthetics."

★★★★☆ *" LOVE the product, but it does not match the picture. Smells great but beautiful tree insignia is not visible when taped onto a dark essential oil, whereas this picture shows a clear one. That's misleading. Label looks sloppily adhered w/ bubbles. Could have made this myself with my roll on bottles/oils, but these pics looked nicer. I wouldn't give this as a gift to anyone based on the aesthetics. "*

Read less

By starryvere on December 20, 2016.

85.     On November 28, 2016, a customer complained about receiving a broken product: "Upon opening the package, I took the top off to roll it on my neck and the entire top is broken and oil went all over my freaking suede shirt. SO NOT HAPPY!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!"

★☆☆☆☆ *" Upon opening the package, I took the top off to roll it on my neck and the entire top is broken and oil went all over my freaking suede shirt. SO NOT HAPPY!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!! "*

Read less

By Amazon Customer on November 28, 2016.

86.     On May 27, 2016, a customer complained about receiving the wrong product: "I ordered 3 bottles of Arabian musk which I've ordered before. What I received is not Arabian Musk. Very disappo."

★★☆☆☆      *"I ordered 3 bottles of Arabian musk which I've ordered before. What I received is not Arabian Musk. Very disappo"*
By Amazon Customer on May 27, 2016.

87.     On August 9, 2015, a customer, nichole sheedy, complained that she received a broken product: "cap came cracked."

★★★★☆      *"cap came cracked"*
By nichole sheedy on August 9, 2015.

88.     On July 14, 2015, a customer, Bobby Bravo, complained that he received a poorly packaged product: "Hello, Package of two arrived in untapped box and did not rcvd packing slip. Please make sure boxes are taped up and will come with a packing slip. Thank you , Bobby Bravo and Reynelda Perez-bravo."

★★★★☆      *"Hello, Package of two arrived in untapped box and did not rcvd packing slip. Please make sure boxes are taped up and will come with a packing slip. Thank you , Bobby Bravo and Reynelda Perez-bravo"*
Read less
By Bobby Bravo on July 14, 2015.

89.     These types of complaints about Defendants are typical of the complaints made about products sold and customer service provided by unauthorized sellers, including the sale of poor quality products.

90.     Upon information and belief additional consumers have made complaints about the quality of products Defendants sold them, including complaints related to Pure Encapsulations products.

**Defendants Do Not Abide By Pure Encapsulations' Quality Control
And Customer Service Requirements**

91.     Defendants do not abide by Pure Encapsulations' quality control measures that are imposed upon genuine Pure Encapsulations products.

92.     Defendants do not comply with Pure Encapsulations' quality control requirements because they sell products on their Amazon storefronts anonymously.  Defendants' storefront pages do not include their mailing address, phone number, email address, or any other contact information.  In fact, as discussed further below, Defendants undertake great efforts to maintain anonymity and prevent anyone from contacting them regarding their business and the shady, poor quality products they sell to unwitting consumers.  Defendants' concerted efforts at maintaining anonymity prevents Pure Encapsulations from addressing any quality issues or negative reviews that arise out of Defendants' sale of Pure Encapsulations products.

93.     Defendants do not comply with Pure Encapsulations' quality control inspection requirements because, upon information and belief, they do not inspect the products they sell for damage, defects, broken seals, evidence of tampering, and other non-conformance from inventory, and sell Pure Encapsulations products that are damaged, have broken seals, and that have been tampered with.

94.     Defendants do not comply with Pure Encapsulations' quality control inspection requirements because, upon information and belief, they do not regularly inspect their inventory for expired or soon-to-be-expired products and remove those products from inventory; rather, Defendants sell Pure Encapsulations products that are expired or soon-to-be expired.

95.     Defendants do not comply with Pure Encapsulations' quality control storage requirements because, upon information and belief, they do not store their products in accordance with the storage guidelines specified by Pure Encapsulations.

ME1 29060617v.1

96.     Defendants do not comply with Pure Encapsulations' quality control requirements related to handling, packaging, and shipping of products because, upon information and belief, they do not package and ship their products in accordance with Pure Encapsulations' requirements.  As set forth above, Defendants ship products in a manner that allows them to become damaged.

97.     Defendants' failure to abide by these quality controls interferes with Pure Encapsulations' quality controls and prevents Pure Encapsulations from exercising control over the quality of Pure Encapsulations products Defendants sell.  Pure Encapsulations is unable to audit Defendants to ensure they are complying with Pure Encapsulations' quality controls and/or close their account if they fail to comply with Pure Encapsulations' quality control requirements.

98.     Defendants' failure to comply with these quality controls also interferes with Pure Encapsulations' quality controls because it prevents Pure Encapsulations from being able to obtain Defendants' assistance with any recall or consumer safety information efforts that may arise related to any products they are selling or have sold in the past.

99.     Defendants also do not comply with Pure Encapsulations' customer service requirements because they are not qualified or trained to accurately describe, demonstrate, and sell the products in their inventory and to advise customers on how to use Pure Encapsulations products safely and properly.

100.    Defendants also do not comply with Pure Encapsulations' customer service requirements because they do not, and are unable to, provide the advice to consumers that Pure Encapsulations requires of its Authorized Resellers and do not provide the type of ongoing support and response to consumer inquiries that Pure Encapsulations requires of its Authorized Resellers.

**Pure Encapsulations Has Attempted to Stop Defendants' Illegal Sale of Pure
Encapsulations Products But Defendants Continue to
Unlawfully Sell Pure Encapsulations Products**

101.    Pure Encapsulations has discovered Defendants illegally selling Pure Encapsulations products on three different storefronts on Amazon – the "Homeopathic USA" f/k/a "Premium Health INC" storefront, the "Vitaworld" storefront, and the "PA Nutrition" storefront.

102.    Pure Encapsulations first discovered Pure Encapsulations products being illegally sold on the "Premium Health INC" f/k/a "Homeopathic USA" storefront in January 2018.

103.    Because Defendants do not disclose their business or contact information on their storefront and sell products through the storefront anonymously, Pure Encapsulations had to spend significant time and money investigating the storefront to attempt to identify the sellers connected to the storefront.  Pure Encapsulations' counsel received information through a subpoena that identified the operators of the "Homeopathic USA" f/k/a "Premium Health INC" storefront as Tsalevich LLC, 18 Claudia Court, Staten Island, New York 10303.

104.    On or about January 23, 2018, counsel for Pure Encapsulations sent Defendants a cease and desist letter for Amazon storefront "Homeopathic USA" f/k/a "Premium Health INC" to 18 Claudia Court, Staten Island, New York 10303, notifying Defendants of their illegal conduct.  The letter advised Defendants that they were tortiously interfering with Pure Encapsulations' contracts and causing harm to Pure Encapsulations. The letter demanded that they immediately cease selling Pure Encapsulations products.

105.    Defendants did not respond to this letter and continued to offer Pure Encapsulations products on the "Homeopathic USA" f/k/a "Premium Health INC" storefront.

ME1 29060617v.1

106.   On or about February 5, 2018, counsel for Pure Encapsulations sent Defendants another letter at 18 Claudia Court, Staten Island, New York 10303, regarding their illegal sales of Pure Encapsulations products on the "Homeopathic USA" f/k/a "Premium Health INC" storefront.   This letter attached a draft complaint and advised Defendants that Pure Encapsulations would file the complaint against them if they did not cease and desist selling Pure Encapsulations products.

107.   Defendants did not respond to this letter.  The "Homeopathic USA" f/k/a "Premium Health INC" storefront was shut down by Amazon on or about November 11, 2018.

108.   Like the "Homeopathic USA" f/k/a "Premium Health INC" storefronts, the the "Vitaworld" and "PA Nutrition" storefronts do not disclose Defendants' business or contact information.

109.   Pure Encapsulations spent significant time and money investigating the "Vitaworld" and "PA Nutrition" to determine who was operating the storefronts.

110.   After conducting an investigation, Pure Encapsulations identified Defendants as the owners and operators of the "Vitaworld" and "PA Nutrition" storefronts at the address 18 Claudia Court, Staten Island, New York 10303.  The Pure Encapsulations products listed on the "Vitaworld" and "PA Nutrition" storefronts match the products that were listed on the "Homeopathic USA" f/k/a "Premium Health INC" storefront before it was shut down.

111.   On or about December 13, 2018, counsel for Pure Encapsulations sent Defendants a cease and desist letter to 18 Claudia Court, Staten Island, New York 10303, notifying Defendants of their illegal conduct.  The letter advised Defendants that they were tortiously interfering with Pure Encapsulations' contracts and causing harm to Pure

25

Encapsulations. The letter demanded that they immediately cease selling Pure Encapsulations products.

112.    Defendants did not respond to this letter and continued to offer Pure Encapsulations products on the "Vitaworld" and "PA Nutrition" storefronts.

113.    As detailed in the foregoing paragraphs, Pure Encapsulations has taken extensive action to stop Defendants' illegal activities.  Pure Encapsulations has also repeatedly explained to Defendants that by illegally selling Pure Encapsulations products that they are, among other things, tortiously interfering with Pure Encapsulations' contracts and causing significant harm to Pure Encapsulations.

114.    Defendants have ignored these letters and draft complaint and have continued to engage in their illegal activities and sales of Pure Encapsulations products.

115.    As discussed above, the products Defendants sell are not genuine Pure Encapsulations products and are materially different from genuine Pure Encapsulations products.

116.    By continuing to sell non-genuine Pure Encapsulations products, Defendants have interfered with Pure Encapsulations' ability to exercise control over Pure Encapsulations products.

117.    Defendants have also misled, and continue to mislead, consumers into believing they are purchasing genuine Pure Encapsulations products when, in fact, they are not.

118.    Further, Defendants' disregard of communications from Pure Encapsulations and continuation of selling of non-genuine products despite being informed of their unlawful conduct, demonstrates that they are acting intentionally, willfully, and maliciously.

**Michael's and Helen's Liability**

26

119.    On information and belief, Michael and Helen are in control of, principals of, and primarily responsible for Tsalevich and Helen Thomas and their actions.

120.    Plaintiff asserts claims against Michael and Helen in both their individual capacities as well as their capacities as corporate officers of Tsalevich and Helen Thomas.

121.    Until it conducts discovery, Plaintiff cannot determine whether Michael and Helen, in their individual capacities, Tsalevich, Helen Thomas, or all four operate the "Vitaworld" and "PA Nutrition" Amazon storefronts.

122.    Alternatively, on information and belief, Michael and Helen direct, control, ratify, participate in, or are the moving force behind the sales of infringing Pure Encapsulations products by Tsalevich and Helen Thomas.  Accordingly, Michael and Helen are personally liable for infringing activities of Tsalevich and Helen Thomas without regard to piercing the corporate veil.

123.    Alternatively, on information and belief, Tsalevich and Helen Thomas follow so few corporate formalities and are so dominated by Michael and Helen that they are merely alter egos of Michael and Helen.  This is reflected by the fact that the corporate entities contain Michael's and Helen's last names, and the publicly-listed address of Tsalevich and Helen Thomas is located at the same address as Michael and Helen's home residence, a townhouse in a residential neighborhood.  Accordingly, Plaintiff is entitled to pierce the corporate veil of Tsalevich and Helen Thomas and hold Michael and Helen personally liable for the infringing activities of Tsalevich and Helen Thomas.

ME1 29060617v.1

**Defendants Are Tortiously Interfering With Pure Encapsulations' Agreements
With Its Authorized Resellers**

124.    Upon information and belief, Defendants have purchased Pure Encapsulations products from Pure Encapsulations Authorized Resellers for purposes of reselling them on the Internet.

125.    The Pure Encapsulations Rules prohibit Pure Encapsulations' Authorized Resellers from selling Pure Encapsulations products to third parties who intend to resell the products.

126.    Defendants were informed of this prohibition by at least January 23, 2018. Indeed, the cease and desist letter Pure Encapsulations sent Defendants on January 23, 2018 informed Defendants that Pure Encapsulations restricts the manner in which Authorized Resellers may sell Pure Encapsulations products and that Authorized Resellers may sell Pure Encapsulations products only to end-user customers through authorized channels and are specifically prohibited from selling products to resellers or any person or entity they know or have reason to know intends to resell the products.

127.    Defendants were also informed that by purchasing Pure Encapsulations products from an Authorized Reseller for purposes of resale, they were causing a breach of the agreement between Pure Encapsulations and its Authorized Reseller and interfering with Pure Encapsulations' agreements and business relationships.

128.    Defendants were also advised that if they continued to acquire Pure Encapsulations products from Pure Encapsulations' Authorized Resellers for purposes of resale, they would be liable for tortiously interfering with Pure Encapsulations' contracts and/or business relationships.

129.    This information was reiterated to Defendants on at least two other occasions:  February 5, and December 13, 2018.

130.    Despite being provided this information, upon information and belief, Defendants have continued to acquire Pure Encapsulations products from Pure Encapsulations' Authorized Resellers.

131.    Upon information and belief, Defendants willfully and knowingly induced unknown Authorized Resellers to breach their agreements with Pure Encapsulations so that they could acquire Pure Encapsulations products and resell them.

**Pure Encapsulations Has Suffered Significant Harm As A Result Of Defendants' Conduct**

132.    As set forth above, the unauthorized sale of Pure Encapsulations products through unauthorized sellers, such as Defendants, has caused significant harm to the Pure Encapsulations brand.

133.    When a consumer receives a poor quality, damaged, or tampered-with product from Defendants, the consumer associates that negative experience with Pure Encapsulations.   As such, Defendants' ongoing sale of unauthorized Pure Encapsulations products harms the Pure Encapsulations brand.

134.    Pure Encapsulations has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

135.    Pure Encapsulations has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships and brand integrity.

136.    Pure Encapsulations is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell Pure Encapsulations

products, causing continued irreparable harm to Pure Encapsulations' reputation, goodwill, relationships and brand integrity.

137.    Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton and contrary to law.

138.    Defendants' willful and continued pattern of misconduct demonstrate intent to harm Pure Encapsulations.

**FIRST CAUSE OF ACTION**
**Unfair Competition**
**15 U.S.C. § 1125(a)**

139.    Pure Encapsulations hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

140.    Defendants willfully advertise, promote, and sell Pure Encapsulations products in interstate commerce on the Internet without the consent of Pure Encapsulations.

141.    The Pure Encapsulations products Defendants advertise, promote, and sell are not authorized for sale by Pure Encapsulations.

142.    Because the products Defendants advertise, promote, and sell do not come with the Guarantee that accompanies genuine Pure Encapsulations products, the products Defendants sell are materially different from genuine Pure Encapsulations products.

143.    The Guarantee is material, as consumers purchasing Pure Encapsulations products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Guarantee.

144.    Pure Encapsulations has established and implemented legitimate and substantial quality control procedures with which genuine Pure Encapsulations products must comply.

ME1 29060617v.1

145.    Pure Encapsulations abides by these quality control procedures and requires all of its Authorized Resellers to abide by these quality controls.

146.    Pure Encapsulations' quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.

147.    The products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Pure Encapsulations' quality controls and customer service requirements.

148.    Because the products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Pure Encapsulations' quality controls and customer service requirements, the products Defendants sell are materially different from genuine Pure Encapsulations products.

149.    Because the products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Pure Encapsulations' quality controls and customer service requirements, the products Defendants sell are not genuine Pure Encapsulations products.

150.    Defendants' unauthorized advertisement, promotion, and sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale come with the Guarantee when, in fact, they do not.

151.    Defendants' unauthorized advertisement, promotion, and sale of products interferes with Pure Encapsulations' quality controls and ability to exercise quality controls over Pure Encapsulations products.

152.    Defendants' unauthorized advertisement, promotion, and sale of Pure Encapsulations products is likely to cause confusion, cause mistake, or deceive consumers

because it suggests that the products Defendants offer for sale are subject to, and abide by, Pure Encapsulations' quality controls when, in fact, they do not.

153.    Defendants' unauthorized advertisement, promotion, and sale of Pure Encapsulations products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Pure Encapsulations products when, in fact, they are not.

154.    Defendants' unauthorized advertisement, promotion, and sale of Pure Encapsulations products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Pure Encapsulations when, in fact, they are not.

155.    As a proximate result of Defendants' actions, Pure Encapsulations has suffered, and continues to suffer immediate and irreparable harm.  Pure Encapsulations has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

156.    Pure Encapsulations is entitled to recover its damages caused by Defendants' unlawful sale of Pure Encapsulations products and disgorge Defendants' profits from their willfully unlawful sales and unjust enrichment.

157.    Pure Encapsulations is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Pure Encapsulations will suffer irreparable harm.

158.    Pure Encapsulations is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 117(a) because Defendants willfully, intentionally, maliciously, and in bad faith sold and advertised Pure Encapsulations products without Pure Encapsulations' consent.

ME1 29060617v.1

## SECOND CAUSE OF ACTION
### Common Law Unfair Competition

159.    Pure Encapsulations hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

160.    Pure Encapsulations products are sold and purchased through its Authorized Resellers throughout the United States, including Massachusetts.

161.    Defendants willfully and knowingly advertise, promote, and sell Pure Encapsulations products in interstate commerce on the Internet and in Massachusetts without the consent of Pure Encapsulations.

162.    The products Defendants advertise, promote, and sell are not authorized for sale by Pure Encapsulations.

163.    Because the products Defendants advertise, promote, and sell do not come with the Guarantee that accompanies genuine Pure Encapsulations products, the products Defendants sell are materially different from genuine Pure Encapsulations products.

164.    The Guarantee is material, as consumers purchasing Pure Encapsulations products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Guarantee.

165.    Pure Encapsulations has established and implemented legitimate and substantial quality control procedures that genuine Pure Encapsulations products must comply with.

166.    Pure Encapsulations abides by these quality control procedures and requires all of its Authorized Resellers to abide by these quality controls.

167.    Pure Encapsulations' quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.

33

168. The products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Pure Encapsulations' quality controls and customer service requirements.

169. Because the products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Pure Encapsulations' quality controls and customer service requirements, the products Defendants sell are materially different from genuine Pure Encapsulations products.

170. Because the products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Pure Encapsulations' quality controls and customer service requirements, the products Defendants sell are not genuine Pure Encapsulations products.

171. Defendants' unauthorized advertisement, promotion, and sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale come with the Guarantee when, in fact, they do not.

172. Defendants' unauthorized advertisement, promotion, and sale of products interferes with Pure Encapsulations' quality controls and ability to exercise quality controls over Pure Encapsulations products.

173. Defendants' unauthorized advertisement, promotion, and sale of Pure Encapsulations products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to, and abide by, Pure Encapsulations' quality controls when, in fact, they do not.

174. Defendants' unauthorized advertisement, promotion, and sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the

ME1 29060617v.1

products Defendants offer for sale are genuine Pure Encapsulations products when, in fact, they are not.

175.    Defendants' unauthorized advertisement, promotion, and sale of Pure Encapsulations products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Pure Encapsulations when, in fact, they are not.

176.    As a proximate result of Defendants' actions, Pure Encapsulations has suffered, and continues to suffer, immediate and irreparable harm.  Pure Encapsulations has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

177.    Pure Encapsulations is also entitled to punitive damages because Defendants acted maliciously toward Pure Encapsulations or in an intentional disregard of the rights of Pure Encapsulations.

**THIRD CAUSE OF ACTION**
**Unfair and Deceptive Trade Practices**
**Mass. Gen. Laws ch. 93A, §§ 1-11**

178.    Pure Encapsulations hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

179.    Pure Encapsulations products are sold and purchased through its Authorized Resellers throughout the United States, including Massachusetts.

180.    Defendants willfully and knowingly advertise, promote, and sell Pure Encapsulations products in interstate commerce on the Internet and in Massachusetts without the consent of Pure Encapsulations.

181.    The products Defendants advertise, promote, and sell are not authorized for sale by Pure Encapsulations.

ME1 29060617v.1

182.    Because the products Defendants advertise, promote, and sell do not come with the Guarantee that accompanies genuine Pure Encapsulations products, the products Defendants sell are materially different from genuine Pure Encapsulations products.

183.    The Guarantee is material, as consumers purchasing Pure Encapsulations products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Guarantee.

184.    Pure Encapsulations has established and implemented legitimate and substantial quality control procedures that genuine Pure Encapsulations products must comply with.

185.    Pure Encapsulations abides by these quality control procedures and requires all of its Authorized Resellers to abide by these quality controls.

186.    Pure Encapsulations' quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.

187.    The products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Pure Encapsulations' quality controls and customer service requirements.

188.    Because the products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Pure Encapsulations' quality controls and customer service requirements, the products Defendants sell are materially different from genuine Pure Encapsulations products.

189.    Because the products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Pure Encapsulations' quality controls and customer service requirements, the products Defendants sell are not genuine Pure Encapsulations products.

ME1 29060617v.1

190.     Defendants' unauthorized advertising, promotion, and sale of Pure Encapsulations products misrepresents the nature, characteristics, qualities, and origin of Defendants' products because it suggests that the products Defendants offer for sale come with the Guarantee and customer service benefits that accompany genuine Pure Encapsulations products when, in fact, they do not.

191.     Defendants' unauthorized advertisement, promotion, and sales of Pure Encapsulations products interferes with Pure Encapsulations' quality controls and ability to exercise quality controls over Pure Encapsulations products.

192.     Defendants' unauthorized advertising, promotion, and sale of Pure Encapsulations products misrepresents the nature, characteristics, qualities, and origin of Defendants' products because it suggests that the products Defendants offer for sale are subject to, and comply with, Pure Encapsulations quality control requirements when, in fact, they do not.

193.     Defendants' unauthorized advertising, promotion, and sale of Pure Encapsulations products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Pure Encapsulations products when, in fact, they are not.

194.     Defendants' unauthorized advertising, promotion, and sale of Pure Encapsulations products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Pure Encapsulations when, in fact, they are not.

195.     Defendants' unauthorized and deceptive advertising, promotion, and sale of Pure Encapsulations products is material and likely to influence customers to purchase the products they sell, as consumers are likely to believe that the products Defendants advertise are

genuine Pure Encapsulations products that are subject to Pure Encapsulations' quality controls requirement and come with the Guarantee other benefits associated with authentic Pure Encapsulations products when, in fact, they do not.

196.     Defendants' unauthorized advertising, promotion, and sale of Pure Encapsulations products is an unfair and deceptive trade practice under Mass. Gen. Laws ch. 93A, §§ 1-11.

197.     As a result of Defendants' unlawful actions, Pure Encapsulations has suffered, and continues to suffer, irreparable harm.  Pure Encapsulations has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

198.     Pursuant to Mass. Gen. Laws ch. 93A § 11, Pure Encapsulations is entitled to injunctive relief enjoining Defendants' conduct.

199.     Pursuant to Mass. Gen. Laws ch. 93A § 11, Pure Encapsulations is entitled to an award of double or treble damages, costs and attorneys' fees.

200.     Pure Encapsulations is also entitled to punitive damages because Defendants acted maliciously toward Pure Encapsulations or in an intentional disregard of the rights of Pure Encapsulations.

## FOURTH CAUSE OF ACTION
### Tortious Interference with Contract and Business Relationships

201.     Pure Encapsulations hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

202.     Pure Encapsulations has contracts and business relationships with its Authorized Resellers, who have a contractual right to sell Pure Encapsulations products in accordance with the Pure Encapsulations Rules.

ME1 29060617v.1

203.    The Pure Encapsulations Rules and Pure Encapsulations' agreements with its Authorized Resellers restrict the manner in which Authorized Resellers may sell Pure Encapsulations products. Specifically, the Pure Encapsulations Rules and Pure Encapsulations' agreements with its Authorized Resellers stipulate that Authorized Resellers may sell only to end-user consumers through approved channels.   Authorized Resellers are prohibited from selling or transferring Pure Encapsulations products to any person or entity for resale without the prior written consent of Pure Encapsulations.

204.    Defendants knew that the Pure Encapsulations Rules and Pure Encapsulations' agreements with its Authorized Resellers prohibit Pure Encapsulations' Authorized Resellers from selling Pure Encapsulations products to third parties, such as Defendants, for purposes of resale.

205.    Defendants were provided notice of this prohibition by at least January 23, 2018, through the cease and desist letter they received from Pure Encapsulations, and reiterated twice, on February 5, and December 13, 2018.

206.    Despite having knowledge of this prohibition, Defendants knowingly and willfully interfered with the Pure Encapsulations Rules and Pure Encapsulations' agreements with its Authorized Resellers by inducing Pure Encapsulations' Authorized Resellers to breach their agreements and sell products to Defendants so they could resell them on the Internet.

207.    Defendants acted with a wrongful purpose by acquiring Pure Encapsulations products from Authorized Resellers for the purpose of resale in violation of the Pure Encapsulations Rules and Pure Encapsulations' agreements with its Authorized Resellers.

208.    Defendants' actions have caused injury to Pure Encapsulations for which Pure Encapsulations is entitled to compensatory damages in an amount to be proven at trial.

ME1 29060617v.1

209.   Pure Encapsulations is also entitled to punitive damages because Defendants acted maliciously toward Pure Encapsulations or in an intentional disregard of the rights of Pure Encapsulations.

## PRAYER FOR RELIEF

WHEREFORE, Pure Encapsulations prays for relief and judgment as follows:

A.   Judgment in favor of Pure Encapsulations and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.   That a preliminary and permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

    i)   Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Pure Encapsulations products;

    ii)   Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Pure Encapsulations products;

    iii)   Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any Pure Encapsulations products sold by them, including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any

other records that would reflect the source of the Pure Encapsulations products that Defendants have sold;

iv)   Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Pure Encapsulations' products;

v)    Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any association with Pure Encapsulations' products with the Enjoined Parties or the Enjoined Parties' website;

vi)   Requiring the Enjoined Parties to take all action to remove unauthorized Pure Encapsulations products from the Internet, including from www.amazon.com;

C.    An award of attorneys' fees, costs, and expenses; and

D.    Such other and further relief as the Court deems just, equitable and proper.

ME1 29060617v.1

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Pure Encapsulations demands a trial by jury on all issues so triable.

Respectfully Submitted,

PURE ENCAPSULATIONS, LLC

By its counsel,

/s/ *John Gutkoski*
John Gutkoski (BBO No. 567182)
jgutkoski@mccarter.com
Keith Toms (BBO No. 663369)
ktoms@mccarter.com
James Thomson (BBO No. 697790)
jthomson@mccarter.com
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
Phone:  (617) 449-6500
Facsimile:  (617) 607-9200

Of Counsel:
Martha Brewer Motley (OH Bar No. 0083788)
Vorys, Sater, Seymour and Pease LLP
52 E. Gay Street
Columbus, Ohio  43215
Telephone:  614-464-5626
Fax:  614-719-5080
Email:  MBMotley@vorys.com
Attorney for Pure Encapsulations LLC *pro hac vice forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system, on the above date, will be sent electronically to all attorneys of record as identified on the Notice of Electronic Filing (NEF).

/s/ *John Gutkoski*

ME1 29060617v.1